IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| PROXI HEALTHCARE STAFFING LLC, | § | |
| *d/b/a* PROXI DENTAL STAFFING, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action No. 3:22-cv-02553-S |
| | § | |
| CURATIVE TALENT, LLC, | § | |
| | § | |
| Defendant. | § | |

## PLAINTIFF'S FIRST AMENDED PETITION

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW PROXI HEALTHCARE STAFFING, LLC, ("Plaintiff" or "Proxi"), and files this First Amended Petition against CURATIVE TALENT, LLC, ("Defendant" or "Seller"), and for cause of action would respectfully show this Honorable Court as follows:

## I.
## PARTIES

1.      Plaintiff PROXI HEALTHCARE STAFFING, LLC is a valid Texas Limited Liability Company with its principal place of business located at 6620 Josephine St., Plano, TX 75024.

2.      Defendant CURATIVE TALENT, LLC is a valid Texas Limited Liability Company with its principal place of business located at 300 W. Las Colinas Blvd., Ste. B-1-104, Irving, TX 75039. Defendant can be served through its registered agent for service of process, CT Corporation System at 1999 Bryan St. Suite 900, Dallas, TX, 75201.

## II.      SUBJECT MATTER JURISDICTION

3.      There is diversity of citizenship among and between the parties to this civil action,

and the amount in controversy, exclusive of interest and costs, exceeds $75,000.00.

4.    Jurisdiction in this judicial district therefore exists pursuant to 28 U.S.C. § 1332.

### III.
### JURISDICTION AND VENUE

5.    Defendant Curative Talent, LLC is subject to this Court's specific and general jurisdiction because they are registered to do business in the State of Texas, are doing business in the State of Texas and the Northern District of Texas, and they have purposefully availed themselves of the rights and privileges of conducting business in Texas, including the Northern District of Texas.

6.    Defendant Curative Talent, LLC regularly conducts business in the State of Texas and the Northern of District of Texas, and they derive substantial revenue from providing services and financial products to residents within the State of Texas and the Northern District of Texas.

7.    The terms of the contract between the parties, specifically the purchase agreement, establishes Dallas County, or any state or federal district court in Dallas County as the proper venue.

8.    The assertion of this Court's jurisdiction over Defendant Bank of America complies with traditional notions of fair play and substantial justice and is consistent with the constitutional requirements of due process.

9.    Venue is proper in the Northern District of Texas because this Court has personal jurisdiction over Defendant Curative Talent, LLC, and also because a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in this District in Dallas County, Texas.

10.    Personal jurisdiction and venue in this judicial District are therefore proper pursuant to 28 U.S.C. § 1391.

**IV.**
**STATEMENT OF CLAIM WITH FACTS COMMON TO ALL CAUSES OF ACTION**

11.    On December 13, 2021, Proxi and Seller executed a formal "Letter of Intent" that summarized the principal terms of an acquisition in which Proxi would acquire the "Dentistry Service Line" of Seller. **Attached as Exhibit 1.** The "Dentistry Service Line" of Seller consisted of "locum tenens" (temporary) dentistry staffing contracts, permanent placement search contracts related to dentistry, and executive search contracts related to dentistry. For several weeks following the execution of the "Letter of Intent," Proxi worked directly with representatives of Seller, representatives of Seller's parent company Doximity, Inc., and Seller's legal counsel to review the business, perform due diligence, and finalize the terms of a purchase agreement. On February 4, 2022 in a written contract, "Asset and Purchase Agreement" (hereinafter "the Agreement"), Proxi entered into an agreement with Seller to purchase the Seller's "Dentistry Service Line" for a price of $850,000.00. **Attached as Exhibit 2**.

12.    Proxi purchased the "Dentistry Service Line" for this amount based on representations made by Seller through reports generated from Seller's Salesforce and NetSuite systems and shared with Proxi. Additionally, Seller granted Proxi access to Seller's Salesforce system in order for Proxi to find and review all accounts, contacts, contracts, and other records related to Seller's dentistry business to be transferred to Proxi. Further, Seller made verbal assurances to Proxi that Seller's dental locum tenens gross profits for a 3-month period beginning February 1, 2022 would be over $150,000.00, and Proxi relied on this assurance as reflected in correspondence with Seller. **Attached as Exhibit 3**.

13.    Seller failed to disclose to Proxi that one of Seller's most profitable locum dentists (hereinafter "Dr. P") had been cancelled from the majority (54 out of 64) of the shifts he was

supposed to work between Feb 7, 2022 and May 20, 2022. The client for this assignment had sent Seller a cancellation notice of Dr. P's shifts on December 14, 2021, the day after the "Letter of Intent" was executed, and this cancellation notice was signed by a representative of Seller. **Attached as Exhibit 4**. However, the newly cancelled shifts for Dr. P remained in "confirmed" status in Curative's Salesforce system, showing gross profit projections where no actual gross profit existed. Seller did not disclose this cancellation to Proxi prior to the sale. In fact, Seller represented that Dr. P was still confirmed for all of these shifts through May 20, 2022 in section 1.4 (g) of the Agreement. Proxi had access to the contents of Seller's Salesforce system, but there was no way of knowing about these shift cancellations since Seller failed to record them in their Salesforce database. In fact, Proxi did not become aware of Dr. P's shift cancellations until February 22, 2022 when the client for Dr. P's assignment provided Proxi with the December 14, 2021 cancellation notice signed by a representative of Seller.

14.    Proxi had previously indicated that a significant reduction in the 3-month projected gross profit below $150,000.00 for the locum tenens division of the "Dentistry Service Line" would result in a reduced offer price from Proxi (see Exhibit 3). As a result of Seller's negligent practices, Proxi relied upon wildly inflated gross profit projections provided by Seller. These overstated projections were a critical piece of Proxi's valuation formula that resulted in an offered purchase price of $850,000.00. Had the cancellation of Dr. P's shifts been disclosed prior to the transaction date, Proxi would have had correct gross profit projections that would have resulted in a significantly lower valuation formula and ensuing offered purchase price.

15.    Seller further interfered with the Agreement with Proxi by wrongfully withholding a dentistry executive search (hereinafter the "Client #1 Adult Dental Director Search") from the sale. The total contract value of this search was $50,000, of which $15,000 was to be billed upon

signing the contract, another $15,000 was to be billed 45 days later, and the final $20,000 was to be billed upon placement of an Adult Dental Director. The first $15,000 billed from this contract belonged to Seller, and was appropriately billed in Seller's NetSuite system (**Attached as Exhibit 5**), but the remaining $35,000 was to transfer to Proxi per the terms of the Agreement. Seller withheld the "Client #1 Adult Dental Director Search" from Proxi by entering the search into their Salesforce system and listing the job as "Administrator" with no other identifying information to hide the search from Proxi before the sale. **Attached as Exhibit 6**. Seller intentionally concealed the nature of this search in their Salesforce system with the knowledge that Proxi was combing through Seller's Salesforce system to pull out all the dentistry contracts as stipulated by the Agreement. The date of 01/24/2022 and the job number of JN-012022-26099 are identical in Exhibit 5 and Exhibit 6; however, only the job description of the search differs. In the Salesforce system, which Proxi had access to, the job description is listed as "Administrator" and the "specialty" field for the search is curiously left blank, leaving no way for Proxi to identify the search as being related to dentistry by relying on Salesforce, the only system Proxi had access to use to identify dentistry searches. Proxi did not have access to Seller's NetSuite system, where the invoice is listed as "Adult Dental Director Search".

16.    Proxi did not learn of the "Client #1 Adult Dental Director Search" until the afternoon of February 7, 2022, several hours after the Agreement had been signed and Proxi had sent their $850,000.00 wire to Seller. Proxi discovered the "Client #1 Adult Dental Director Search" on the afternoon of February 7, 2022, by seeing an invoice for the search that was mysteriously "backed out of" the Dentistry Receivables that were part of the working capital settlement in the transaction. When Proxi asked what the invoice was for and why it was "backed out," the VP of Finance of Seller's parent company shared that it was for a Dental Executive Search

and that he was told by Seller's CEO that the search was not part of the sale. Upon being questioned about this by Proxi, Seller's CEO attempted to argue this search was exempt from the sale as a "non-clinical leadership" position despite this being contrary to the Agreement, which explicitly includes dental executive searches as part of the "Dentistry Service Line." **Attached as Exhibit 7**. In fact, Seller willingly transferred to Proxi a separate Dental Director search for "Client #2." The difference between the Client #2 search and the Client #1 search is that all of the guaranteed fees for the Client #2 search had already been billed by Seller, whereas the Client #1 search still had another $15,000 in guaranteed fees remaining to be billed.

17.    Throughout the transaction Seller engaged in behavior intended to represent to Proxi that Seller would be conveying the entire "Dentistry Service Line" and any like services to Proxi. This was not the case as Seller failed to disclose vital information regarding the cancellation of 54 of Dr. P's shifts that negatively affected the value of the "Dentistry Service Line" purchased by Proxi. Additionally, Seller failed to deliver the "Client #1 Adult Dental Director Search" valued at $50,000.00 in total (with $35,000 belonging to Proxi) as part of the transaction. Had Proxi known the truth behind these misrepresentations prior to signing the Agreement, Proxi would have offered $601,849.00 for the "Dentistry Service Line" under the same valuation methodology that resulted in Proxi's original offer of $850,000.00, a difference of $248,151.00. **Attached as Exhibit 8.** Proxi also experienced opportunity costs from remediation in the form of lost wages and lost gross profit in the amount of $79,749.00. **Attached as Exhibit 9.** The total damages from the difference in Proxi's offer price and the opportunity costs of lost wages and lost gross profit is $327,900.00. **Attached as Exhibit 10.**

### V.
### FIRST CAUSE OF ACTION: BREACH OF CONTRACT

18.     Plaintiff incorporates by reference into this cause of action all the facts and allegations in subparagraphs 6 -12.

19.     The elements of a breach of contract claim under Texas law include: "(1) the existence of a valid contract; (2) performance or tendered performance by plaintiff; (3) breach of the contract by defendant; and (4) damages sustained by the plaintiff as a result of the breach." *See Keszler* v. *Mem'l Med. Ctr. of E. Tex.*, 105 S.W.3d 122, 128 (Tex. App.–Corpus Christi 2003, no pet.).

20.     Here, the Parties have a valid Agreement dated February 4, 2022 and executed between Proxi and Seller. Proxi performed its part of the Agreement by tending payment of $850,000.00 to Seller. After receiving payment, Seller breached the Agreement by failing to convey to Proxi what was promised which was Seller's "Dentistry Service Line." Instead, Seller decided to withhold the "Client #1 Adult Dental Director Search" by attempting to characterize this search as a "non-clinical leadership" search and thus not a part of the transaction.

21.     However, this type of search falls squarely within the Schedule 1 – List of Assets listed within the Agreement but was never conveyed to Proxi. Because of this breach, Proxi has suffered damages in the form of lost revenues from business that Seller wrongfully withheld.

**SECOND CAUSE OF ACTION: NEGLIGENT MISREPRESENTATION**

22.     Plaintiff incorporates by reference into this cause of action all the facts and allegations in subparagraphs 6 -12.

23.     The elements of a negligent misrepresentation claim under Texas law include: (1) a representation is made by a defendant in the course of his business, or in a transaction in which he has a pecuniary interest; (2) the defendant supplies "false information" for the guidance of

others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *See McCamish, Martin, Brown & Loeffler* v. *F.E. Appling Interests,* 991 S.W.2d 787, 791 (Tex.1999).

24.    Here, Seller made a negligent representation to Proxi when Seller stated that the locum tenens division of the "Dentistry Service Line" would have gross profits of over $150,000.00 for a 3-month period by February 1, 2022. However, Seller provided this false information after 54 of Dr. P's future shifts had been cancelled, which Seller knew would negatively affect their gross profits. The total gross profit lost as a result of the cancellation was $44,371.88 which consisted of $31,171.88 in scheduled gross profit and $13,200.00 in liability for not providing adequate notice of cancellation to Dr. P. **Attached as Exhibit 11.** Additionally, the cancellation of Dr. P's 54 scheduled shifts was never recorded in Seller's Salesforce system, despite a representative of Seller countersigning the notice of the cancellation of Dr. P's 54 shifts on December 14, 2021. Seller provided this false information and failed to exercise reasonable care or competence in obtaining or verifying the accuracy of the information prior to communicating the information to Proxi. Further, Seller allowed Proxi to view incorrect Salesforce system data mere weeks before signing the Agreement with Proxi to induce Proxi into consummating the transaction for the originally agreed price of $850,000.00.

25.    Seller did not share with Proxi that Dr. P's 54 shifts had been cancelled, but had they done so, the purchase price would have been reduced significantly. Proxi relied on Seller's false information and went through with the transaction for the originally agreed price of $850,000.00. However, the "Dentistry Service Line" purchased by Proxi was worth drastically less than the original sales price due to lost gross profits as a result of the cancellation of Dr. P's 54

shifts.

### THIRD CAUSE OF ACTION TORTIOUS INTERFERENCE WITH A CONTRACT

26.    Plaintiff incorporates by reference into this cause of action all the facts and allegations in subparagraphs 6 -12.

27.    In Texas, the elements for tortious interference with a contract include: (1) the existence of a contract subject to interference; (2) willful and intentional interference; (3) interference that proximately caused damage and (4) actual damage or loss. *See Texas Integrated Conveyor Systems, Inc*. v. *Innovative Conveyor Concepts, Inc*. (Tex. App. 2009) 300 S.W.3d 348.

28.    Here, Seller tortiously interfered with the Agreement they entered into with Proxi by withholding certain business from their "Dentistry Service Line" that had been conveyed to Proxi through the Agreement. On February 4, 2022, Seller entered into the Agreement with Proxi by which Seller conveyed their "Dentistry Service Line' to Proxi.

29.    However, shortly before the signing of the Agreement, Seller attempted to interfere with the Agreement by hiding and withholding the "Client #1 Adult Dental Director Search" which was worth $50,000.00 in total, $35,000 of which belonged to Proxi. This search contract clearly falls within the definition of the "Dentistry Service Line" of Seller, but Seller attempted to conceal the contract in Salesforce by assigning the vague title of "Administrator" and failing to include the words "dental" or "dentist" or "dentistry" anywhere within the description.

30.    It was not until the afternoon of February 7, 2022, which was several hours after the Agreement had been signed and accepted by the Parties, that Proxi discovered a $15,000.00 invoice for the position which had never been disclosed by Seller. When Seller's attempt to hide this search became obvious to Proxi, Seller tried to argue that this was a "non-clinical leadership" position and thus exempt from the sale. However, this argument is fruitless and clearly contradicts

the contents of the Agreement.

31.    Seller's interference caused damage to Proxi in the form of lost profits as a result of wrongfully withholding the "Client #1 Adult Dental Director Search" from the transaction. Proxi was entitled to collect the second fee of $15,000, plus an additional $20,000 placement fee upon filling the "Client #1 Adult Dental Director Search." On March 1, 2022, Seller contacted Client #1 and convinced their contact to "cancel" the "Client #1 Adult Dental Director Search" so the Seller could issue a credit memo and change the search to a medical specialty that would no longer be restricted from Seller's Covenant Not to Compete from Section 1.5 of the Agreement. Seller's willful interference with the "Client #1 Adult Dental Director Search" was a clear violation of Section 1.5 of the Agreement that caused actual damages of $35,000, plus proximate damages in the form of Proxi's continued relationship with Client #1 and the ability to use that search as a platform to win similar searches with other dental clients.

**FOURTH CAUSE OF ACTION TEXAS DECEPTIVE TRADE PRACTICES ACT**

32.    Plaintiff incorporates by reference into this cause of action all the facts and allegations in subparagraphs 6 -12.

33.    Seller's actions violated the DTPA. These claims arose from (1) Seller's false, misleading, or deceptive acts or practices to Proxi's detriment and (2) engagement in an unconscionable course of action that violated the DTPA, Texas Business and Commerce Code §17.41 et. Seq.

34.    The Texas Deceptive Trade Practices Act ("DTPA") is a powerful statute that provides consumers of goods or services with relief for certain acts by the Sellers of such goods or services. Its express purpose is "protecting consumers against false, misleading and deceptive business practices, unconscionable actions, and breach of warranty" and providing "efficient and

economical procedures to secure such protection. *See Bus. Staffing, Inc.* v. *Jackson Hot Oil Serv.*, 401 S.W.3d 224 (Tex. App.—El Paso 2012, pet. Denied). To seek recovery under the Texas DTPA, you must qualify as a consumer. A consumer may be an individual, partnership, corporation, LLC or even a state agency. See DTPA Sec. 17.45.

35.    The elements for recovery under the DTPA include: i) the plaintiff was a consumer; ii) the defendant either engaged in false, misleading, or deceptive acts, i.e., violated a specific laundry list provision of the DTPA, or engaged in an unconscionable action or course of action; and iii) the DTPA laundry-list violation or unconscionable action was a producing cause of the plaintiff's injury. *See Premium Assets, Inc.* v. *Garcia*, No. 13-13-00549-CV, 2015 WL 5626197 (Tex. App.—Corpus Christi Aug. 27, 2015, pet. Denied).

36.    From the laundry list of actions prohibited by Section 17.46 of the DTPA, Seller is in violation of the following: (5) representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not; (7) representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another; (9) advertising goods or services with intent not to sell them as advertised; (24) failing to disclose information concerning goods or services which was known at the time of the transaction if such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed.

37.    For the reasons listed above it is clear that through the course of the transaction Seller engaged in behavior intended to represent to Proxi that they would be conveying the entire "Dentistry Service Line" and any like services to Proxi. However, this was simply untrue as Seller

failed to deliver the "Client #1 Adult Dental Director Search" as part of the transaction. Further, Seller failed to disclose vital information to Proxi that the majority of Dr. P's future shifts had been cancelled, thus negatively impacting the value of the services purchased by Proxi.

## VI.
## JURY TRIAL REQUEST

38.     Plaintiff hereby formally requests a trial by jury.

## VIII.
## ATTORNEY'S FEES

39.     Plaintiff incorporates by reference into this cause of action all the facts and allegations in subparagraphs 6 -12.

40.     Plaintiff hired legal counsel and incurred attorney's fees to pursue Plaintiff's claim   for declaratory judgment under Chapter 37 of the Texas Civil Practice and Remedies Code. Texas Civil Practice and Remedies Code Section 37.009 provides that, "In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just."

## VIII.
## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff requests that Defendant be cited to appear and answer, and, upon trial, Plaintiff be granted judgment against the Defendant awarding Plaintiffs the following:

1.     Actual damages in an amount in excess of the minimum jurisdictional limits of the Court;

2.     For reasonable and necessary attorney's fees;

3.     For economic damages;

4.     Prejudgment interest;

5.     Costs of suit;

6.     Post-judgment interest; and

7.      Such other and further relief to which Plaintiff may be justly entitled.


Respectfully submitted:

KELLEY CLARKE, P.C.


Anthony Waddell (Bar No. 24042105)
tony@kelleyclarke.com
Ryan Ritenour (Bar No. 24110285)
ryan@kelleyclarke.com
603 E. Broadway Street
Prosper, Texas 75078
972.253.4440
866.611.9852 fax
**ATTORNEYS FOR PLAINTIFF PROXI
HEALTHCARE STAFFING LLC d/b/a
PROXI DENTAL STAFFING**

**EXHIBIT 1**

December 13, 2021

Mark McGuire
6620 Josephine Street
Plano, TX 75024

Re: Proposal to Sell the Assets of the Dentistry Service Line of Curative Talent, LLC

Dear Mark:

This letter (this "**Letter**") is intended to summarize the principal terms of a proposal being considered by you, doing business by way of an LLC that you will create to be called Proxi Healthcare Staffing, LLC d/b/a Proxi Dental Staffing ("**Buyer**") regarding the possible acquisition of substantially all of the assets, and certain specified liabilities, of the Dentistry Service Line (the "**Business**") of Curative Talent, LLC ("**Seller**"). The possible acquisition of the Business is referred to as the "**Transaction**" and Buyer and Seller are referred to collectively as the "**Parties.**"

   1.    Acquisition of Assets and Purchase Price.

         (a)    Subject to the satisfaction of the conditions described in this Letter, at the closing of the Transaction Buyer would acquire substantially all of the assets, and certain specified liabilities, of the Business (the "**Assets**"), free and clear of all encumbrances, at the purchase price set forth in Section 1(b).

         (b)    The purchase price for the Assets would be $850,000 (the "**Purchase Price**") in cash payable at the closing of the Transaction.

         (c)    For the avoidance of doubt, the Business includes but is not limited to customer contracts, provider contracts, active assignment documents, all dental client records from Curative's database, all dental candidate records from Curative's database, all credentialing documentation including the standard credentialing checklist for dental candidates, and all detailed net revenue and timesheet records for all locums, retained search, contingent placement, permanent placement, and executive search history. The Business includes the following specialties: General Dentistry, Pediatric Dentistry, Orthodontics and Dentofacial Orthopedics, Endodontics, Periodontics, Prosthodontics, Oral/Maxillofacial Surgery, Oral/Maxillofacial Pathology, Oral/Maxillofacial Radiology, Dental Anesthesiology, Orofacial Pain, Oral Medicine, Dental Hygienists, and Dental Assistants.

   2.    Proposed Definitive Agreement. As soon as reasonably practicable after the execution of this Letter, the Parties shall commence to negotiate a definitive purchase agreement

(the "**Definitive Agreement**") relating to Buyer's acquisition of the Assets, to be drafted by Seller's counsel. The Definitive Agreement would include the terms summarized in this Letter and such other representations, warranties, conditions, covenants, indemnities and other terms that are customary for transactions of this kind and are not inconsistent with this Letter. The Parties shall also commence to negotiate ancillary agreements to be drafted by Seller's counsel, such as, if necessary, a bill of sale and an assignment and assumption agreement.

      3.    <u>Conditions</u>. The Parties' obligation to close the proposed Transaction will be subject to customary conditions, including:

      (a)    Written confirmation of assignability of all client contracts from Seller to Buyer;

      (b)    Preemptive testing of database record transfer to be satisfactorily approved by Buyer;

      (c)    Approval of the Managing Member of Seller and the Board of Directors of Seller's parent entity;

      (d)    Seller to fund working capital to Buyer in an amount equal to the open accounts receivable for the Business at closing, excluding open accounts receivable for Dental Wellness Center and Smile Makers of Memphis. The maximum working capital amount to be funded is $200,000, and the minimum amount to be funded is $160,000;

      (e)    the Parties' execution of the Definitive Agreement and the ancillary agreements;

      (f)    Each of Lindsay Harris and Joshua Kumher entering into employment agreements with Buyer on terms agreed with Buyer, which shall include similar salary, commission, and benefit package to both individuals. Additionally, an equity stake in Buyer will be offered, with the ability to contribute capital for a larger equity holding;

      (g)    Seller to offer Lindsay Harris and Joshua Kumher $14,000 each, payable April 30, 2022, if the company achieves C45 attainment, net of these payouts, by March 31, 2022;

      (h)    Seller and its affiliates entering into a restrictive covenants not to compete with the Business for 5 years following the closing unless given written consent by Mark McGuire;

      (i)    Buyer and its affiliates entering into a restrictive covenant not to hire or solicit any employee of Seller or encourage any such employee to leave such employment for a period of 5 years following the closing unless given written consent by the CEO of Curative Talent, LLC.;

      (j)    Transaction close date will be January 14, 2022, unless both parties agree to extend the close date to a future Friday prior to February 25, 2022.

4.      Termination. This letter will automatically terminate and be of no further force and effect upon the earlier of (i) execution of the Definitive Agreement by Buyer and Seller, (ii) mutual agreement of Buyer and Seller, and (iii) on January 1, 2022 Notwithstanding anything in the previous sentence, paragraphs 6, 7, 8 and 10 shall survive the termination of this Letter and the termination of this Letter shall not affect any rights any Party has with respect to the breach of this Letter by another Party prior to such termination.

5.      Bid Expiration. This offer will remain in effect until December 14, 2021 unless accepted or rejected by Seller, or withdrawn by Buyer prior to that time.

6.      GOVERNING LAW. **THIS LETTER SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH INTERNAL LAWS OF THE STATE OF TEXAS, WITHOUT GIVING EFFECT TO ANY CHOICE OR CONFLICT OF LAW PROVISION OR RULE (WHETHER OF THE STATE OF TEXAS OR ANY OTHER JURISDICTION) THAT WOULD CAUSE THE APPLICATION OF LAWS OF ANY JURISDICTION OTHER THAN THOSE OF THE STATE OF TEXAS.**

7.      Confidentiality. This Letter and the terms of the Transaction are considered Confidential Information of each Party.  "Confidential Information" means any non-public, confidential or proprietary information disclosed by a Party (the "Disclosing Party") to the other Party (the "Recipient"), its affiliates, or their respective employees, officers, directors, agents, attorneys, accountants, or advisors (collectively, "Representatives"), whether disclosed orally or in written, electronic, or other form of media, and whether or not marked or designated as "confidential," and which may include, without limitation, information concerning the Disclosing Party's and its affiliates' and their respective customers', suppliers', and other third parties' business affairs including, without limitation, finances, investments, customer information, supplier information, products, services, engagement rates, audience reach, member/membership data, pricing, internal practices and procedures, forecasts, sales, plans, records, budgets, strategies, trade secrets and other intellectual property.  Except as required by applicable federal, state or local law or regulation, the term "Confidential Information" as used in this Agreement shall not include information that (a) at the time of disclosure is, or thereafter becomes, generally available to and known by the public other than as a result of a violation of this Agreement by the Recipient or any of its Representatives; (b) at the time of disclosure is, or thereafter becomes, available to the Recipient on a non-confidential basis from a third-party source, provided that such third party is not and was not prohibited from disclosing such Confidential Information to the Recipient by a legal, fiduciary, or contractual obligation to the Disclosing Party; (c) was known by or in the possession of the Recipient or its Representatives before being disclosed by or on behalf of the Disclosing Party under this Agreement; or (d) is independently developed by the Recipient without use of or reference to the Disclosing Party's Confidential Information.

8.      No Third Party Beneficiaries. Except as specifically set forth or referred to herein, nothing herein is intended or shall be construed to confer upon any person or entity other than the Parties and their successors or assigns, any rights or remedies under or by reason of this Letter.

DocuSign Envelope ID: 51492D14-BA14-4B45-8E6A-62D91BC7E84B

9.      <u>Expenses</u>. The Parties will each pay their own transaction expenses, including the fees and expenses of investment bankers and other advisors, incurred in connection with the proposed Transaction.

10.      <u>No Binding Agreement</u>. This Letter reflects the intention of the Parties, but for the avoidance of doubt neither this Letter nor its acceptance shall give rise to any legally binding or enforceable obligation on any Party, except with regard to paragraphs 6 through 10 hereof. No contract or agreement providing for any transaction involving the Business shall be deemed to exist between Seller and Buyer and any of its affiliates unless and until a final definitive agreement has been executed and delivered.

11.      <u>Miscellaneous</u>. This Letter may be executed in counterparts, each of which shall be deemed to be an original, but all of which together shall constitute one agreement.  The headings of the various sections of this Letter have been inserted for reference only and shall not be deemed to be a part of this Letter.

12.      <u>Termination Fee</u>. Once all parties have signed, if there is a termination of the agreement without proper cause, the Buyer will pay a $10,000 breakage fee.

[SIGNATURE PAGE FOLLOWS]

DocuSign Envelope ID: 51492D14-BA14-4B45-8E6A-62D91BC7E84B

If you are in agreement with the terms set forth above and desire to proceed with the proposed Transaction on that basis, please sign this Letter in the space provided below and return an executed copy to the attention of Jennifer Chaloemtiarana.

Sincerely,

Curative Talent, LLC

*Anna Bryson*

Anna Bryson

Chief Financial Officer, Doximity

12/13/2021

Agreed to and accepted:

Mark McGuire

*Mark McGuire*

12/13/2021

5

**EXHIBIT 2**

DocuSign Envelope ID: 882BF439-E978-4986-B10B-CB345EF27BED

## ASSET & BUSINESS PURCHASE AGREEMENT

THIS ASSET & BUSINESS PURCHASE AGREEMENT (this "**Agreement**") is made as of February 4, 2022 by and between Curative Talent, LLC, a Texas limited liability company located at 370 W. Las Colinas Blvd., Ste 104, Irving, TX 75039 (the "**Seller**"), and Proxi Healthcare Staffing, LLC d/b/a Proxi Dental Staffing a Texas limited liability company located at 6620 Josephine St., Plano, TX 75024 (the "**Buyer**"), collectively ("the Parties"). The Parties hereby agree as follows:

1.  **Defined Terms; Purchase and Sale of the Dentistry Service Line of Curative Talent, LLC.**

    1.1.    **Defined Terms Used in this Agreement.**  In addition to the terms defined above and in the body of this Agreement, the following terms used in this Agreement shall be construed to have the meanings set forth or referenced below.

    (a)    "**Affiliate**" used with respect to any Person, means (i) any other Person which, directly or indirectly, controls or is controlled by or is under common control with such Person; (ii) any Person that is an officer of, member of, partner in or trustee of, or serves in a similar capacity with respect to, such Person or of which such Person is an officer, member, partner or trustee, or with respect to which such Person serves in a similar capacity; and (iii) any Person that, directly or indirectly, is the beneficial owner of more than 50% of any class of equity securities of such Person or of which such Person is directly or indirectly the beneficial owner of more than 50% of any class of equity securities.  For purposes of this definition, "control" (excluding the correlative terms "controlling," "controlled by" and "under common control with"), with respect to any Person, shall mean possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

    (b)    "**Person**" means any individual, corporation, partnership, trust, limited liability company, association or other entity.

    (c)    "**Securities Act**" means the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder.

    (d)    "**The Business**" means the assets, of the Dentistry Service Line only of Curative Talent, LLC as identified and set forth in this Agreement and Schedules and Exhibits attached hereto. The Business includes the following specialties: General Dentistry, Pediatric Dentistry, Orthodontics and Dentofacial Orthopedics, Endodontics Periodontics, Prosthodontics, Oral/Maxillofacial Surgery, Oral/Maxillofacial Pathology, Oral/Maxillofacial Radiology, Dental Anesthesiology, Orofacial Pain, Oral Medicine, Dental Hygienists, Dental Assistants.

    (e)    "**The Transaction**" means the acquisition of the Business.

    (f)    "**The Transaction Agreements**" means this Agreement and all of its Schedules and Exhibits.

    (g)    "**The Assets**" means the assets described and listed in Schedule 1 to this Agreement.

(h)     "**Material Adverse Effect**" means a material adverse effect on the business, assets (including intangible assets), liabilities, financial condition, property, prospects or results of operations of the Business.

**1.2**     **Purchase and Sale of the Business; Sale of the Assets of the Dentistry Service Line of Curative Talent, LLC.**

(a)     Subject to the terms and conditions of this Agreement, the Buyer agrees to purchase on the Closing Date, and the Seller agrees to sell to the Buyer on the Closing Date, the Business which shall be comprised of the Assets of the Business as set forth in this Agreement and its Schedules and Exhibits. The Assets belonging to the Business and being acquired by Buyer are detailed in **Schedule 1** (List of Assets). The purchase price to be paid by Buyer to Seller at Closing is **eight hundred fifty thousand dollars ($850,000.00)** (the "Purchase Price"). There is no real property being transferred in this sale and purchase. The purchase and sale shall be reflected in a Bill of Sale to be provided at Closing by Seller. **Exhibit A.**

(b)     Further, Seller will fund working capital to Buyer in an amount equal to the open Accounts Receivable (as defined below) for the Business at Closing, excluding open accounts receivable for Dental Wellness Center and Smile Makers of Memphis. The maximum working capital amount to be funded is $200,000, and the minimum amount to be funded is $160,000. The payment of the Purchase Price by Buyer is a condition precedent to the payment of this working capital amount by Seller. Seller will make the payment to Buyer for this described working capital line once the Purchase Price is received from Buyer. Seller will prepare a summary schedule of the then calculated applicable open Accounts Receivables on the first business day after Closing. Buyer will inspect and approve the list by signing an acceptance, approval, and confirmation (**Exhibit B**), at which point Seller will initiate payment for the next business day. "**Accounts Receivable**" are the open and outstanding billed and invoiced amounts due from Curative's Dentistry Service Line customers which have not yet been paid, discounted or written off as of the Closing date. Accounts Receivable do not include work in progress. Hours submitted for work performed prior to January 31, 2022 that are awaiting client approval will be counted in the Accounts Receivable total at the hourly bill rate multiplied by the number of submitted hours.

**1.3**     **Excluded Assets.** The following assets are excluded from the purchase and sale of the Business, and Seller will retain title to and ownership of such Assets:

(a)     all cash and cash equivalents of the Business;

(b)     all securities of Seller;

(c)     all deposit, securities, and investment accounts of any kind and nature for the Business;

(d)     all Accounts Receivable of the Business in excess of $200,000 as of the date and time of Closing;

(e)    all open Accounts Receivable for Dental Wellness Center and Smile Makers of Memphis;

(f)    all prepaid deposits, taxes and portions of prepaid contracts e.g., insurance, software licenses, licenses, etc. related to the Business, or claims of Seller for any federal, state, local or foreign tax refunds;

(g)    Work in progress specific to certain fees limited to the retained search Dentistry Service Line, meaning applicable fees/billings/claims as described below. A list of these items will be presented at Closing, along with the additional documentation described below.

(i) Interview Fees for a candidate interview that took place prior to the Closing, but not yet billed by Seller.  Written client confirmation of the interview date, time, and location will be provided at Closing.

(ii) Placement Fees for a candidate with an executed offer of employment from the client, with a signature date on or prior to the Closing, which has not yet been billed by Seller. Executed employment contract with dates of signature by both parties will be provided at Closing.

(h)    all notes receivable owing to Seller;

(i)    the company seals, certificates of formation, minute books, unit/ownership books, tax returns, books of account and/or other records having to do with the company formation and organization of Seller;

(j)    all computers, equipment, computer or equipment leases and software of Seller, except for the laptops being purchased separately by Buyer;

(k)    all proprietary materials of Seller meaning and including all sales collateral, training materials, customer contact lists, policies and procedures and any and all other material relating to the Business or other operations of Seller, whether confidential or not, electronic files and information, media containing information, documents, and any other tangible items, that are not specifically enumerated in Schedule 1, The List of Assets being transferred.

(l)    Notwithstanding anything else in this Agreement, its Schedules and Exhibits, Seller shall be allowed to keep a copy of the Business' books and records sufficient for historical audit and tax purposes.

(m)    all other assets of the Business not listed in **Schedule 1**, "List of Assets."

### 1.4    Additional Purchase and Sale Provisions.

The Parties obligation to Close the proposed Transaction will be subject to the following additional provisions:

(a)    Buyer agrees to pay to Seller after Closing the commission due to Seller's recruiters/representative(s) for the successful placement of any of the following searches that are

being transferred with this Agreement, in which the candidate placed was presented to the client by Seller's recruiters/representatives prior to Closing and the placement is finalized and revenue and commission are earned after Closing, but on or prior to July 3, 2022. Buyer will retain the remaining revenue for these searches and will notify Seller upon completion of any of these searches.   Then Seller will share applicable recruiter's current week commission percentage (dependent on T-13 billings for that recruiter) and commission amount that will be due from Buyer to Seller 15 days after the Buyer's collection of billed amounts below.

    i.   River Valley Health and Dental Center (DDS 8794389): $10,000.00 to be billed for Nicholas Clinton

    ii.   Beaufort Oral & Facial Surgery (JN -032021-24143): $15,000.00 to be billed for Dan Meehan

    iii.   U.S. Oral Surgery Management (OMFS 11994492): $15,000.00 to be billed for Madison McCallum

    iv.   29th Street Dental Care (JN -092021-25409): $10,000.00 to be billed for Craig Harris

(b)    Buyer's satisfaction of the confirmation of the assignability of all client contracts for the Business from Seller to Buyer prior to Closing. Buyer will provide a written acceptance and approval to Seller of this confirmation at Closing. **Exhibit B.**

(c)    Seller and Buyer will perform a preemptive testing of database record transfer for the Business to be satisfactorily approved by Buyer. Buyer will provide a written acceptance to Seller of the testing and database record transfer at Closing. **Exhibit C.**

(d)    Seller to offer Lindsay Harris and Joshua Kumher $14,000 each, payable April 30, 2022, if Seller achieves the Performance Factor (as defined in that certain Performance Based Restricted Stock Unit Award Agreement previously entered into by each of Harris and Kumher, (the "**PSU Agreement**")) and so long as the Performance Factor is achieved net of these payouts to Harris and Kumher, by March 31, 2022. To be confirmed by Buyer at Closing. **Exhibit D.**

(e)    Lindsay Harris and Joshua Kumher shall enter into employment agreements with Buyer on terms mutually agreeable to Lindsay Harris and Joshua Kumher and Buyer. Buyer will provide a written confirmation that these agreements have been completed and executed at Closing which shall be signed and acknowledged by Buyer, Lindsay Harris and Joshua Kumher. **Exhibit E.**

(f)    Approval of the Managing Member of Seller and the Board of Directors of Seller's parent entity. Evidence of such approval(s) to be provided by Seller at Closing. **Exhibit F.**

(g)    Aspen Dental. The Parties have agreed that Seller shall continue to bill Aspen Dental, and only Aspen Dental, for dates of service that occur within a period of fifteen weeks (15) following the Closing date for services performed by Buyer. The Parties have agreed to the following "Post Close Order to Cash Process" ("the/this Process") in order that Buyer's services performed for Aspen Dental during this 15 week period, if any, may be billed through Aspen's "Shiftwise" invoicing system by and through Seller's account. Seller makes no warranty or guarantee to Buyer as to the accuracy of the information submitted into Shiftwise for this period

or for any payment by Aspen Dental on any invoices submitted. Buyer understands that it is taking all the risk from this process without exception including but not limited to: all risk for collections; all risk for accuracy and mistakes; all risk that Aspen Dental may not approve this proposed process and may not allow Buyer to perform services; and, all risks of claims, disputes and non-payment by Aspen Dental. Further Buyer certifies and warrants that it has obtained coverage for medical/dental malpractice insurance in an amount of at least $1 million per occurrence and $3 million aggregate coverage effective at least by the date of Closing, will name Seller as an additional insured for at least the 15 week period referenced above, and will provide a proof/certificate of insurance, and proof of Seller as an additional insured, at Closing. This Process shall be for provider David Parris, only, who is currently on assignment, and is scheduled to work through May 20th, 2022, which both parties acknowledge may extend beyond the 15 week period post-Closing. The Parties agree not to add any additional Providers to this Process. The Buyer agrees to notify Aspen Dental of the below plan in writing (email acceptable), with cc to David Coffman (dcoffman@curativetalent.com), Curative's VP Finance, by the date of Closing, to ensure transparency related to this process.

(i)     Post Close Order to Cash Process for Aspen Dental ("Aspen"):

1) Proxi will gather timecard from provider and coordinate with Aspen for approval;
2) Proxi will pay provider's 1099 fees weekly;
3) Proxi will coordinate with Aspen for entry of timecard into client's system (Shiftwise) under Curative's account;
4) Curative billing team will advance/accept the timecard/resulting invoice in Shiftwise based on Proxi's request/notice that it is correct, ready and complete;
5) Aspen will pay Curative via ACH for items in Shiftwise, with any all collection reminders/follow up communications handled by Proxi;
6) Upon Curative's receipt of payment for post-close services, funds will be deposited and tracked separately in Curative's 2011 Customer Overpayments GL account;
7) Curative will remit collected funds to Proxi within 15 business days of receipt by Curative.

**1.5     Seller Covenant Not To Compete.**  Seller, and its affiliates, will agree for a period of five (5) years from the Closing date of this Agreement, that they will not own, manage, operate, finance, join, control or participate in the ownership, management, operation, financing or control of, or be connected as a shareholder, director, officer, partner, principle, agent, representative, or otherwise with, or use or permit their names to be used in connection with, the Business or enterprise engaged in the same or substantially similar services as the Dentistry Service Line being purchased from Seller.  In the event that the provisions of this Section 1.5 should ever be deemed to exceed the time, geographic, product or other limitations permitted by applicable law in any jurisdiction, then such provisions shall be deemed reformed in such jurisdiction to the maximum time, geographic, product or other limitations permitted by applicable law. Seller and Buyer specifically acknowledge and agree that the foregoing restrictions are reasonable and necessary to protect the legitimate interests of Buyer, that Buyer would not have entered into this Agreement,

5

for the purchase of certain Assets of Seller, in the absence of such restrictions, that any violation of such restrictions will result in irreparable injury to Buyer, that the remedy at law for any breach of the foregoing restrictions will be inadequate, and that, in the event of any such breach, Buyer, in addition to any other relief available to it, shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damages.

**1.6    Buyer Restrictive Covenant Non-Solicitation and Non-Compete.**

(a) Buyer, and its directors, officers, members, managers, employees, and affiliates, ("Buyer group") agree not to solicit or hire any employee, contractor or consultant of Seller, except for: certain general technology consultants such as Nuage, directly or indirectly, nor encourage, entice, persuade, or induce any such employee, contractor or consultant to leave their employment with Seller, nor assist any other person or entity in directly or indirectly hiring or soliciting for employment any such employee, contractor or consultant (including any person no longer employed by Seller but who had been employed by Seller within the six (6) months prior to such hiring or solicitation), for a period of five (5) years following the Closing date, unless given written consent by the CEO of Curative Talent, LLC (for such general technology consultants referred to above, Buyer agrees not to encourage, entice, persuade, or induce any consultant to leave or end their relationship with Seller, nor interfere in or disrupt any relationships between Curative and its vendors);

(b) Further, Buyer and Buyer Group, agree not to solicit, entice, persuade or induce any customer or prospective customer in the healthcare provider and services industry, except for Dentistry services only, with whom Buyer group had contact or received or accessed Confidential Information to terminate, alter or limit its, his or her relationship with the Seller, directly or indirectly, or in the case of any such respective customer, not to enter into a business relationship with the Seller, or otherwise interfere with the Seller's relations with its customers or prospective customers for a period of five (5) years following the Closing date, unless given written consent by the CEO of Curative Talent, LLC. Buyer agrees and warrants that Mark McGuire, Lindsay Harris and Joshua Kumher remain bound by the restrictive covenants and agreements contained in their employment confidentiality agreements with Seller, any Separation Agreements, and any other agreements with Seller.  Any such restrictive covenants survive and continue according to their terms, except as provided for in this Agreement;

(c) Buyer and Seller specifically acknowledge and agree that the foregoing restrictions are reasonable and necessary to protect the legitimate interests of Seller, that Seller would not have entered into this Agreement, for the purchase of assets of Seller, in the absence of such restrictions, that any violation of such restrictions will result in irreparable injury to Seller, that the remedy at law for any breach of the foregoing restrictions will be inadequate, and that, in the event of any such breach, Seller, in addition to any other relief available to it, shall be entitled to temporary and permanent injunctive relief without the necessity of proving actual damages.

**1.7    Closing.**

(a)    Closing shall take place remotely via facsimile, electronic or e-mail delivery of documents and signatures, at 12:01 a.m. Central Time on Monday, February 7, 2022, or at such

other time, date and place as the Seller and the Buyer mutually agree upon in writing. Due to the hour of Closing, the payments by Buyer and Seller to each other described in section 1.2(a) and 1.2(b) shall be made as soon as practicable on Monday, February 7, 2022 for Buyer payment under section 1.2(a) and on Tuesday, February 8, 2022 for subsequent Seller payment under section 1.2(b) and as described below in sub-section 1.7(c). At the Closing, the Seller shall deliver to the Buyer the following documents, other documents named in this Agreement, and any other documents reasonably requested by Buyer:

(i)      An executed Bill of Sale representing the Business and the Assets of the Business being purchased by the Buyer, (**Exhibit A**), against payment of the Purchase Price by Buyer by cashier's check payable to the Seller or by wire transfer to a bank account designated by the Seller;

(ii)     written confirmation of assignability of all client contracts for Business from Seller to Buyer confirmed by Buyer (**Exhibit B**);

(iii)    Written confirmation of the offer by Seller to pay $14,000 each to Lindsay Harris and Joshua Kumher, payable April 30, 2022, if, and only if, Seller achieves the Performance Factor in the PSU Agreement net of these payouts to Harris and Kumher, by March 31, 2022, confirmed by Buyer (**Exhibit D**);

(iv)     Evidence of the approval of the Managing Member of Seller and the Board of Directors of Seller's parent entity for this Transaction (**Exhibit F**);

(b)     At the Closing, the Buyer shall deliver to the Seller the following documents, other documents named in this Agreement, and any other documents reasonably requested by Seller:

(i)      Written acceptance of the confirmation of assignability of all client contracts for the dentistry business from Seller to Buyer (**Exhibit B**);

(ii)     Written acceptance of the testing and database record transfer for the dentistry business (**Exhibit C**);

(iii)    Written acceptance of the offer by Seller to pay $14,000 each to Lindsay Harris and Joshua Kumher, payable April 30, 2022, if, and only if, Seller achieves the Performance Factor in the PSU Agreement net of these payouts to Harris and Kumher, by March 31, 2022, confirmed by Buyer (**Exhibit D**);

(iv)     Employment Agreements for Lindsay Harris and Joshua Kumher, or confirmation signed by Mark McGuire, Lindsay Harris and Joshua Kumher, that they have been approved and executed (**Exhibit E**);

(v)      Written confirmation from Mark McGuire, Lindsay Harris and Joshua Kumher that all wages, bonuses, reimbursements, payments for vacation, sick, PTO time, and for any other reason owed or claimed by them from Seller arising from their employment have been made prior to or at Closing, except for the possible Performance Factor attainment pertaining to Harris and Kumher indicated above in section 1.7(a)(iii) (**Exhibit G**).  For clarity, the Buyer

acknowledges that only Lindsay Harris and Joshua Kumher's wages accrued up to the Closing time will be paid via a final check, their Q4'22 target bonuses are not payable related to their resignations nor are wages related to accrued vacation, sick or PTO time due based on their standing as Texas based employees;

      (vi)    Company minutes/resolution approving the Transaction signed by all three managing members, Mark McGuire, Lindsay Harris and Joshua Kumher **(Exhibit H);**

      (vii)    State of Texas certificate of formation of Buyer. **(Exhibit I)**

      (viii)    Buyer proof of Insurance with Curative Talent, LLC as named additional insured. **(Exhibit J)**

      (ix)    WIP Interview Fees Confirmation. **(Exhibit K)**

      (x)    WIP Placement Fees Confirmation. **(Exhibit L)**

      (xi)    Notice sent to Aspen Dental of Post Close Order to Cash Process (**Exhibit M)**

    **(c)**    Payment Obligations on Closing Date. The Parties agree to the payment of the Purchase Price by Buyer to Seller no later than 5 o'clock pm CST on the Closing Date, Monday, February 7, 2022. The Parties further agree to the payment of the Working Capital Funding by Seller to Buyer subsequent to confirmation of deposit of the Purchase Price and the Buyer's acceptance of the summary schedule of Accounts Receivable prepared by the Seller as detailed in 1.2(b). The Parties understand and agree that the initiation of a payment by electronic transfer on February 7, 2022 by either Party may result in the payment not posting to the recipient's account until the next business day. The Buyer shall provide to Seller:

      (i)    Proof of the payment of the Purchase Price by Buyer by cashier's check payable to the Seller or by wire transfer, or other transfer, to a bank account designated by the Seller;

And, Seller shall provide to Buyer:

      (ii)    Proof of payment of the working capital funding described in 1.2(b) above, once the payment of the Purchase Price by Buyer is confirmed;

**2.**    <u>**Representations and Warranties of the Buyer**</u>.  The Buyer hereby represents covenants and warrants to the Seller that:

    **2.1**    <u>**Organization, Good Standing, Corporate Power and Qualification.**</u>  The Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Texas and has all requisite power and authority to carry on its business as presently conducted.  The Buyer is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have, or would be reasonably expected to have,

DocuSign Envelope ID: 882BF439-E978-4986-B10B-CB345EF27BED

either individually or in the aggregate, a Material Adverse Effect on Buyer.

      **2.2**    **Authorization.**  The Buyer has full power and authority to enter into this Agreement; and, this Agreement to which the Buyer is a party, when executed and delivered by the Buyer, will constitute valid and legally binding obligations of the Buyer, enforceable in accordance with its terms. All limited liability company action required to be taken by the members/managers/officers of the Buyer in order to authorize the Buyer to enter into this Agreement have been taken. An authorized representative of the Buyer has read and fully understands this Agreement. The Agreement, when executed and delivered by the Buyer, shall constitute valid and legally binding obligations of the Buyer, enforceable against the Buyer in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies. The Buyer and person signing on its behalf is duly authorized to fully and completely resolve all disputes between the Parties that are the subject of this Agreement. The representative(s) signing this Agreement on Buyer's behalf are duly authorized to executive this Agreement in the capacities identified below.

      **2.3**    **Purchase Entirely for Own Account; Sophisticated Buyer.**  This Agreement is made with the Buyer in reliance upon the Buyer's representation and warranty to the Seller, which by the Buyer's execution of this Agreement, the Buyer hereby confirms, that (a) the Business to be acquired by the Buyer will be acquired for investment for the Buyer's own account, not as a nominee or agent, and not with a view to the resale or distribution of any part thereof, and that the Buyer has no present intention of selling, granting any participation in, or otherwise distributing the same, (b) the Buyer does not presently have any contract, undertaking, agreement or arrangement with any Person to sell, transfer or grant participations to such Person or to any third Person, with respect to any of the Business interests acquired hereunder, (c) the Buyer has such knowledge, skill and experience in Business, financial and investment matters so that it is capable of evaluating the merits and risks of a purchase and an investment in the Business of the Dentistry Service Line of Curative Talent, LLC, and to the extent necessary, the Buyer has relied upon appropriate professional advice regarding the investment, tax and legal merits and consequences of this Agreement and owning Business of Dentistry Service Line of Curative Talent, LLC, and (d) the Buyer is an "accredited Buyer" as defined in Rule 501(a) under the Securities Act.

      **2.4**    **Litigation.**  There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or, to the Buyer's knowledge, currently threatened (i) against the Buyer or, to the Buyer's knowledge, any officer, member, manager, or director of the Buyer (arising, in the case of any litigation against any such officer, member, manager, or director out of their employment or other relationship with the Buyer); or (ii) against the Buyer that questions the validity of this Agreement or the right of the Buyer to enter into it, or to consummate the transactions contemplated by this Agreement.  Neither the Buyer nor, to the Buyer's knowledge, any of its officers, members, managers, or directors is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of officers, members, managers or directors, such as would affect the Buyer).  There is no action, suit, proceeding or investigation by the Buyer pending or which the Buyer intends to initiate.  The foregoing includes, without limitation, actions, suits,

proceedings or investigations pending or threatened in writing (or any basis therefor known to the Buyer) involving the prior employment of any of the Buyer's employees, their services provided in connection with the Buyer's Business, or any information or techniques allegedly proprietary to any of their former employers, or their obligations under any agreements with prior employers.

### 2.5 **Compliance with Other Instruments; Laws; Permits.**

(a)    The Buyer is not in material violation or default (i) of any instrument, judgment, order, writ or decree, (ii) under any note, indenture or mortgage, or (iii) under any lease, agreement, contract or purchase order, or of any provision of federal, regulatory, state or local statute, rule or regulation applicable to the Buyer. The execution, delivery and performance of the Agreement and the consummation of the transactions contemplated by the Agreement will not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either (i) a default under any such provision, instrument, judgment, order, writ, decree, contract or agreement or (ii) an event which results in the creation of any lien, charge or encumbrance upon any assets of the Buyer or the suspension, revocation, forfeiture, or nonrenewal of any permit or license applicable to the Buyer.

(b)    The Buyer has all material franchises, permits, licenses and any similar authority necessary for the conduct of the Business at the time of Closing. The Buyer is not in default in any material respect under any of such franchises, permits, licenses or other similar authority.

**2.6 Availability of Funds.** Buyer will have available and will possess on the Closing Date sufficient funds to enable Buyer to consummate the transactions contemplated by this Agreement.

**2.7 No Bankruptcy.** No bankruptcy proceedings are pending or contemplated by or, to the knowledge of Buyer, threatened against Buyer. Buyer is not insolvent, and the execution of this Agreement, and the consummation of the transactions contemplated hereunder, will not render Buyer insolvent.

**3. Representations and Warranties of the Seller.** The Seller hereby represents and warrants to the Buyer that the following representations are true, correct and complete as of the Closing Date.

**3.1 Organization, Good Standing, Corporate Power and Qualification.** The Seller is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite power and authority to carry on its business as presently conducted. The Seller is duly qualified to transact business and is in good standing in each jurisdiction in which the failure to so qualify would have, or would be reasonably expected to have, either individually or in the aggregate, a Material Adverse Effect on Seller.

**3.2 Authorization.** The Seller has full power and authority to enter into this Agreement; and, this Agreement to which the Seller is a party, when executed and delivered by the Seller, will constitute valid and legally binding obligations of the Seller, enforceable in accordance with its terms. All limited liability company action required to be taken by the members/managers/officers of the Seller in order to authorize the Seller to enter into this

Agreement have been taken. An authorized representative of the Seller has read and fully understands this Agreement. The Agreement, when executed and delivered by the Seller, shall constitute valid and legally binding obligations of the Seller, enforceable against the Seller in accordance with their respective terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent conveyance, or other laws of general application relating to or affecting the enforcement of creditors' rights generally or (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies. The Seller and person signing on its behalf is duly authorized to fully and completely resolve all disputes between the Parties that are the subject of this Agreement. The representatives signing this Agreement on Seller's behalf are duly authorized to executive this Agreement in the capacities identified below.

    3.3    **Title to Assets**. Seller holds and owns good and marketable title to all of the Assets of the Business being transferred free and clear of all liens and encumbrances.

    3.4    **Litigation**.    There is no claim, action, suit, proceeding, arbitration, complaint, charge or investigation pending or, to the Seller's knowledge, currently threatened (i) against the Seller or, to the Seller's knowledge, any officer, member, manager, or director of the Seller (arising, in the case of any litigation against any such officer, member, manager, or director, out of their employment or other relationship with the Seller) that affects or relates to the Business or the Assets being transferred to Buyer except for the claims and/or suits identified in Schedule 2; or (ii) against the Seller that questions the validity of this Agreement or the right of the Seller to enter into it, or to consummate the transactions contemplated by this Agreement. Neither the Seller nor, to the Seller's knowledge, any of its officers, members, managers, or directors is a party or is named as subject to the provisions of any order, writ, injunction, judgment or decree of any court or government agency or instrumentality (in the case of officers, members, managers, or directors, such as would affect the Seller) that affects or relates to the Business or Assets being transferred to Buyer. There is no action, suit, proceeding or investigation by the Seller pending or which the Seller intends to initiate that affects or relates to the Business or Assets being transferred to Buyer.

    3.5    **Compliance with Other Instruments; Laws; Permits.**

    (a)    The Seller is not in material violation or default (i) of any provisions of its governing documents, (ii) of any instrument, judgment, order, writ or decree, (iii) under any note, indenture or mortgage, or (iv) under any lease, agreement, contract or purchase order, or of any provision of federal, regulatory, state or local statute, rule or regulation applicable to the Seller or the Assets that has a material effect on, or relates materially to, the Business or Assets being transferred to Buyer.  The execution, delivery and performance of the Agreement and the consummation of the transactions contemplated by the Agreement will not result in any such violation or be in conflict with or constitute, with or without the passage of time and giving of notice, either (i) a default under any such provision, instrument, judgment, order, writ, decree, contract or agreement or (ii) an event which results in the creation of any lien, charge or encumbrance upon any assets of the Seller or the suspension, revocation, forfeiture, or nonrenewal of any permit or license applicable to the Seller.

    (b)    The Seller has had all material franchises, permits, licenses and any similar

authority necessary for the conduct of the Business prior to Closing. The Seller is not in default in any material respect under any of such franchises, permits, licenses or other similar authority prior to Closing.

**4.** **Conditions to the Buyer's Obligations at Closing.** The obligation of the Buyer to purchase the Business shall be subject to the fulfillment, on or before such Closing, of each of the following conditions, unless waived by the Buyer in writing:

**4.1** **Representations and Warranties.** The representations and warranties of the Seller contained in Section 4 shall be true and correct in all respects as of such Closing.

**4.2** **Performance.** The Seller shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by the Seller on or before such Closing.

**4.3** **Other Documents.** Such other supporting documents and certificates as the Buyer may reasonably request and as may be required pursuant to this Agreement.

**5.** **Conditions of the Seller's Obligations at Closing.** The obligation of the Seller to sell the Business to the Buyer at the Closing shall be subject to the fulfillment, on or before the Closing, of each of the following conditions, unless waived by the Seller in writing:

**5.1** **Representations and Warranties.** The representations and warranties of the Buyer contained in Section 3 shall be true and correct in all respects as of such Closing.

**5.2** **Performance.** The Buyer shall have performed and complied with all covenants, agreements, obligations and conditions contained in this Agreement that are required to be performed or complied with by them on or before such Closing.

5.3 **Payment of Purchase Price.** The Buyer shall have paid the Purchase Price to Seller as required by this Agreement.

**5.4** **Qualifications.** All authorizations, approvals, licenses or permits of any governmental authority or regulatory body of the United States or of any state, county or city that are required in connection with the continued operation of the Business pursuant to this Agreement shall be obtained and effective as of such Closing.

**5.5** **Member's Certificate and Approval.** The managing member of the Buyer shall have delivered to the Seller prior to or at the Closing a certificate certifying (i) the Certificate of Formation of the Buyer issued by the Secretary of State of the State of Texas, and the absence of any amendments thereto, (ii) the LLC Agreement, and (iii) resolutions of the Board of Directors/Members/Managers of the Buyer (as constituted immediately prior to the Closing) approving the Agreement and the transactions contemplated under the Agreement, and copies of these documents. **Exhibit H.**

**5.6** **Documents.** Each of the documents and other items required to be delivered, or caused to have been delivered, by Buyer pursuant to this Agreement must have been delivered.

**5.7** **Compliance with Conditions.** Buyer will have complied with and performed all agreements, covenants and conditions required by this Agreement, and will have taken all actions and received all approvals required for Buyer to purchase the Business and Assets  as provided in this Agreement.

## 6.    Indemnification

**6.1** **Seller's Indemnification**. Seller shall indemnify, defend and hold harmless Buyer, its affiliates and their officers, members, managers, agents, attorneys, advisors, representatives, successors and assigns from and against the entirety of and in respect of any and all demands, claims, causes of action, administrative orders and notices, losses, costs, liabilities, damages and expenses (including, without limitation, reasonable attorney fees) resulting from, in connection with, or arising out of a breach of any representation or warranty made by Seller herein the failure of Seller to comply with, or Seller's breach of, any of the covenants or agreements in this Agreement; or any action, suit or proceeding relating to the foregoing.

Further, from and after the Closing, the Seller will reimburse, indemnify, defend and hold harmless the Buyer, and its affiliates, successors and assigns, ("Seller indemnified Parties") against and in respect of:

(a) any and all liabilities and obligations of any nature whatsoever relating to the Seller or the Seller's business, prior to the Closing;

(b) any and all actions, suits, claims, demands, or legal, administrative, arbitration, governmental or other proceedings or investigations against any Seller indemnified Party that relate to the Seller, the Seller's business, or its Assets, or the Assets being acquired herein, or result from or arise out of any event, occurrence, action, inaction, or transaction occurring before the Closing Date;

(c) any and all damages, losses, deficiencies, liabilities, costs and expenses incurred or suffered by any Seller indemnified Party that result from, relate to or arise out of any of the matters referred to in subparagraph (a) and (b) above; and

(d) any and all actions, suits, claims, proceedings, investigations, demands, assessments, audits, fines, judgments, costs and other expenses (including, without limitation, reasonable legal fees and expenses) incident to any of the foregoing or to the enforcement of this Section 6.1.

**6.2** **Buyer's Indemnification**. Buyer shall indemnify, defend and hold harmless Seller, its affiliates and their officers, directors, agents, attorneys, advisors, representatives, successors and assigns from and against the entirety of and in respect of any and all demands, claims, causes of action, administrative orders and notices, losses, costs, liabilities, damages and expenses (including, without limitation, reasonable attorney fees) resulting from, in connection with, or arising out of a breach of any representation or warranty made by Buyer herein; the failure of Buyer to comply with, or Buyer's breach of, any of the covenants or agreements in this Agreement; or any action, suit or proceeding relating to the foregoing.

Further, from and after the Closing, the Buyer will reimburse, indemnify, defend and hold harmless the Seller, and its affiliates, successors and assigns, ("Buyer indemnified Parties") against and in respect of:

(a) any and all liabilities and obligations of any nature whatsoever relating to the Buyer or the Buyer's business, prior to the Closing;

(b) any and all actions, suits, claims, demands, or legal, administrative, arbitration, governmental or other proceedings or investigations against any Buyer indemnified Party that relate to the Buyer, the Buyer's business, or its Assets, or the Business and Assets being acquired herein, or result from or arise out of any event, occurrence, action, inaction, or transaction occurring after the Closing Date;

(c) any and all damages, losses, deficiencies, liabilities, costs and expenses incurred or suffered by any Buyer indemnified Party that result from, relate to or arise out of:

(i) any claim by any former employee of Seller who is employed by Buyer after Closing which is made or brought after the Closing Date, or results from or arises out of any event, occurrence, action, inaction or transaction occurring after the Closing Date;

(ii) any of the matters referred to in subparagraph (a) and (b) above; and

(d) any and all actions, suits, claims, proceedings, investigations, demands, assessments, audits, fines, judgments, costs and other expenses (including, without limitation, reasonable legal fees and expenses) incident to any of the foregoing or to the enforcement of this Section 6.2.

(e) any and all actions, suits, claims, proceedings, investigations, demands, assessments, audits, fines, judgments, costs and other expenses (including, without limitation, reasonable legal fees and expenses) incident to the "Post Close Order to Cash Process," the Process, for Aspen Dental as set out in section 1.4(g).

## 7.    **Miscellaneous.**

**7.1    Survival of Representations and Warranties; Indemnification.**  Unless otherwise set forth in this Agreement, the representations and warranties of the Seller and the Buyer contained in or made pursuant to this Agreement shall survive the execution and delivery of this Agreement and the Closing for the applicable statute of limitations period and shall in no way be affected by any investigation or knowledge of the subject matter thereof made by or on behalf of the Buyer or the Seller.

**7.2    Successors and Assigns; No Benefit to Others.**  The terms and conditions of this Agreement shall inure to the benefit of and be binding upon the respective successors and permitted assigns of the Parties; provided, however, that the Buyer may not assign any of its rights and obligations to any other Person without the prior written consent of the Seller.  Nothing in this Agreement, express or implied, is intended to confer upon any party other than the Parties hereto or their respective successors and assigns any rights, remedies, obligations, or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

DocuSign Envelope ID: 882BF439-E978-4986-B10B-CB345EF27BED

**7.3** **Governing Law.** This Agreement shall be governed by and interpreted in accordance with the substantive laws of the State of Texas exclusively, regardless of the laws that might otherwise govern under applicable principles of conflicts of law. Any action arising from or relating to this Agreement that cannot be settled through consultation shall be brought exclusively in a state court located in Dallas County, Texas, or exclusively in a federal court that serves the district or division in which Dallas County sits, and no other venue, and each Party irrevocably consents to such exclusive venue and jurisdiction; and, waives the right to contest personal jurisdiction or object to venue based on such courts being an inconvenient forum.

**7.4** **Counterparts.** Counterparts may be signed and delivered via DocuSign, Adobe Sign, facsimile, electronic mail (including PDF), or signature or other transmission method and any counterpart so delivered shall be deemed to have been duly and validly delivered and be valid and effective for all purposes. This Agreement may be executed in any number of counterparts, each of which is an original for all purposes, but all of which together constitute one agreement. A facsimile or electronic copy of an original signature may be used in the place of an original signature.

**7.5** **Titles and Subtitles.** The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

**7.6** **Notices.** All notices and other communications given or made pursuant to this Agreement shall be in writing and shall be deemed effectively given upon the earlier of actual receipt or: (a) personal delivery to the Party to be notified, (b) when sent, if sent by electronic mail during normal business hours of the recipient, and if not sent during normal business hours, then on the recipient's next business day, (c) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (d) one (1) business day after deposit with a nationally recognized overnight courier, freight prepaid, specifying next business day delivery, with written verification of receipt. All communications shall be sent to the respective Parties at their address as set forth on the signature page hereto, or to such e-mail address or address as subsequently modified by written notice given in accordance with this Section 7.6.

**7.7** **No Finder's Fees.** Each Party represents that it neither is nor will be obligated for any finder's fee or commission in connection with this transaction. The Buyer agrees to indemnify and to hold harmless the Seller from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Buyer or any of its officers, employees, or representatives is responsible. The Seller agrees to indemnify and hold harmless the Buyer from any liability for any commission or compensation in the nature of a finder's or broker's fee arising out of this transaction (and the costs and expenses of defending against such liability or asserted liability) for which the Seller or any of its officers, employees or representatives is responsible.

**7.8** **Voluntary Execution of Agreement**. The Parties expressly represent and warrant that they have participated in the negotiation and preparation of this Agreement, and that they are executing this Agreement voluntarily, with the benefit and advice of counsel, or with the opportunity to select and retain the benefit and advice of independent counsel, without any duress,

coercion, or undue influence.  The Parties fully understand that if any facts concerning the claims giving rise to this Agreement should be found to be other than or different from the facts now believed to be true, that it is agreed that this Agreement shall be and will remain in full force and effect notwithstanding such difference in facts.

**7.9    Each Party Relying on its Own Judgment**.  The Parties acknowledge that they are not executing this Agreement on the basis of any inducements, promises, statements, representations, or warranties made by the opposing party or their counsel, other than those embodied in this Agreement. It is understood and agreed that the Parties hereto have carefully reviewed this Agreement, that they fully understand its terms, that they sought and obtained independent legal advice with respect to the negotiation and preparation of the Agreement, that this Agreement has been negotiated and prepared by the joint efforts of the respective attorneys, if any, for each of the Parties, and that the Parties have relied wholly upon their own judgment and knowledge (and the advice of their respective attorneys and advisors).'

**7.10    No Reliance on Representations or Assumed Facts**.  THE PARTIES ALSO EXPRESSLY WARRANT AND REPRESENT THAT IN EXECUTING THIS AGREEMENT, THEY ARE NOT RELYING ON ANY STATEMENTS OR REPRESENTATIONS BY ANY OTHER PARTY, ITS AGENTS, REPRESENTATIVES OR ATTORNEYS, WITH REGARD TO THE SUBJECT MATTER OR EFFECT OF THIS AGREEMENT, NOR TO ANY OTHER FACTS OR ISSUES WHICH MIGHT BE DEEMED MATERIAL TO THE DECISION TO ENTER INTO THIS AGREEMENT, OTHER THAN AS SPECIFICALLY SET FORTH IN THIS AGREEMENT.

**7.11    Consideration**. The Parties acknowledge that the covenants and recitals contained in this Agreement provide good and sufficient consideration for every promise, duty, release, obligation and right contained in this Agreement.

**7.12    Section Numbers and Titles**.  The Parties acknowledge that the section numbers and section titles have been set forth herein for convenience only, and they shall not be construed to limit or extend the meaning or interpretation of any part of this Agreement.

**7.13    No Strict Construction**.  The language used in this Agreement is chosen jointly by the Parties to express their mutual intent and no rule of construction will be applied against any Party, including any rule of draftsmanship.  The Parties hereby expressly agree that any uncertainty or ambiguity existing herein shall not be interpreted against any of them.  Except as expressly limited by this paragraph, all of the applicable rules of interpretation of contract shall govern the interpretation of any uncertainty or ambiguity.  The term "including" as used in this Agreement is used to list items by way of example and shall not be deemed to constitute a limitation of any term or provision contained herein.

**7.14    Merger Clause**. This Agreement, along with any schedules, exhibits, appendices, addendums, and amendments hereto, encompasses the entire agreement of the parties, and supersedes all previous understandings and agreements between the Parties, whether oral or written. The Parties hereby acknowledge and represent, by affixing their hands and seals hereto, that said Parties have not relied on any representation, assertion, guarantee, warranty, collateral

DocuSign Envelope ID: 882BF439-E978-4986-B10B-CB345EF27BED

contract or other assurance, except those set out in this Agreement, made by or on behalf of any other party or any other person or entity whatsoever, prior to the execution of this Agreement.

**7.15    Prior Agreements Superseded**. This Agreement supersedes all prior agreements, written or oral, between the Parties pertaining to the Business, It is understood and agreed that all future rights and obligations of the Parties as to each other shall be governed solely by this Agreement. Notwithstanding anything contained in this clause "prior agreements superseded," any individual agreements (including their employee confidentiality agreements) between the Seller and Mark McGuire, Lindsay Harris, and Joshua Kumher respectively are excluded from this language, and such agreements remain in full force and effect including any continuing obligations or restrictive covenants contained in these agreements, except as provided for in this Agreement.

**7.16    No Oral Modifications**.  This Agreement, and its provisions, may not be modified, amended, waived or terminated orally. No modification, amendment or termination, or any waiver of any of the provisions of this Agreement, shall be binding unless same is in writing and is signed by the party against whom such modification, amendment or waiver is sought to be enforced. Any amendment, modification or waiver effected in accordance with this <u>Section 7.16</u> shall be binding upon the Buyer and each transferee of the Business, each future holder of all such interests, and the Seller.

**7.17    No Waiver**.  The failure of any of the Parties to enforce at any time any provision of this Agreement shall not be construed to be a waiver of such provision, nor in any way affect the validity of this Agreement or any part thereof or any right of any party thereafter to enforce each and every provision.  No waiver of any breach of this Agreement shall be held to constitute a waiver of any other breach.

**7.18    Execution of Necessary Documents**.  The Parties further covenant and agree to execute any and all documents reasonably necessary to effectuate the provisions of this Agreement.

**7.19    Best Efforts and Good Faith.**  The Parties hereby agree to use their best efforts and good faith in carrying out the terms of this Agreement. With respect to accounting issues generally and specifically (i) the proper applications of payments from customers improperly made to Seller or Buyer which are received after the Closing by Seller or Buyer; (ii) the rebate from Buyer to Seller for commissions on searches being transferred which are successfully completed, which were already begun by recruiters/representatives of Seller prior to Closing, and where Seller owes commissions to its recruiters/representatives, the Parties agree to cooperate and use their best efforts in good faith to make sure payments are properly applied and the rebates, or improperly addressed customer payments, are paid to Seller or Buyer within fifteen (15) days of receipt of payment to Buyer or Seller from customer or provider.

**7.20    Fees and Expenses.**  Each Party shall pay its own costs, fees and expenses pertaining to this Agreement.

**7.21    Confidentiality.** The Parties shall keep the contents of this Agreement confidential and not divulge its terms to any person or entity except that any party may disclose the terms of this Agreement in response to court order or to the extent necessary to enforce the Agreement by legal process, or in order to comply with the Agreement.  Notwithstanding the foregoing, the Parties are expressly permitted to disclose the existence and terms of the Agreement to its legal counsel, accountants, business advisors, auditors, members, bond holders or any state or federal agency, or as required by law.

**7.22    Attorneys' Fees.**  If any action at law or in equity (including arbitration) is necessary to enforce or interpret the terms of any of the Agreements, its Exhibits or Schedules, the prevailing Party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such Party may be entitled.

**7.23    Severability.** The invalidity or unenforceability of any provision hereof shall in no way affect the validity or enforceability of any other provision.

**7.24    Delays or Omissions.**  No delay or omission to exercise any right, power or remedy accruing to any Party under this Agreement, upon any breach or default of any other party under this Agreement, shall impair any such right, power or remedy of such non-breaching or non-defaulting party nor shall it be construed to be a waiver of any such breach or default, or an acquiescence therein, or of or in any similar breach or default thereafter occurring; nor shall any waiver of any single breach or default be deemed a waiver of any other breach or default theretofore or thereafter occurring.  Any waiver, permit, consent or approval of any kind or character on the part of any Party of any breach or default under this Agreement, or any waiver on the part of any Party of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.  All remedies, either under this Agreement or by law or otherwise afforded to any Party, shall be cumulative and not alternative.  For clarification purposes, in the event of a default by the Buyer, the Seller shall have all appropriate legal and equitable remedies, including but not limited to the right to specific performance.

**7.25    Force Majeure.** Neither Party shall be liable for delay in delivery or nonperformance in whole or in part (other than a failure to pay any amount due hereunder), nor shall the other Party have the right to terminate this Agreement, where delivery or performance has been affected by a condition beyond such Party's reasonable control, including fires, floods, freezes and extreme weather, earthquakes, embargoes, shortages, pandemics, epidemics, quarantines, war, acts of war (whether war be declared or not), terrorism, insurrections, riots, civil commotion, strikes, lockouts or other labor disturbances, acts of God or acts, or omissions or delays in acting by any government authority; provided, however, that the Party affected by such a condition shall, within ten (10) days of its occurrence, give notice to the other Party stating the nature of the condition, its anticipated duration and any action being taken to avoid or minimize its effect. The suspension of performance shall be of no greater scope and no longer duration than is reasonably required and the nonperforming Party shall use commercially reasonable efforts to remedy its inability to perform.

**7.26    Taxes.** Neither the Seller nor the Buyer shall be responsible for the other's sales, transfer or documentary taxes, if any, or any other taxes of whatever kind and character, federal,

state or local, due as a result of this Transaction, the transfer of the Assets to the Buyer, or the assumption of Liabilities by the Buyer, or any and all other costs or fees directly relating to the transfer of the Assets, or the assumption of the Liabilities. No Party to this Agreement, nor any of their officers, employees, members, managers, attorneys or agents has made any representation or agreement, express or implied, as to the tax consequences of the transactions contemplated by this Agreement or the tax consequences of any action pursuant to or arising out of this Agreement.

[*signature page follows*]

IN WITNESS WHEREOF, the Parties have executed and delivered this Asset and Business Purchase Agreement for the purchase of the Business and Assets of the Dentistry Service Line of Curative Talent, LLC described herein as of February 4, 2022.

**SELLER:**

**CURATIVE TALENT, LLC**

By: _____
Name: Jeff Bowling
Title:   Chief Executive Officer

Address:
370 W. Las Colinas Blvd., Ste 104, Irving, TX 75039

Notices To:
Jeff Bowling
Chief Executive Officer
300 W. Las Colinas Blvd., Ste B-1-104, Irving, TX 75039

Copy of Notice To:
Jacob Kring
Hedrick Kring Bailey, PLLC
1700 Pacific Ave., #4650
Dallas, TX 75201
(214) 880-9600
jacob@hedrickkring.com

**BUYER:**

**PROXI HEALTHCARE STAFFING, LLC**

By: _____
Name: Mark McGuire
Title:   Managing Member

Address:
6620 Josephine St., Plano, TX 75024
Notices to:
Mark McGuire
Managing Member
Proxi Healthcare Staffing, LLC
6620 Josephine St., Plano, TX 75024

**SCHEDULE 1 – LIST OF ASSETS, free and clear of all encumbrances:**

Customer Contracts limited to the Dentistry Business.
Provider Contracts limited to the Dentistry Business.
Active Assignment Documents limited to the Dentistry Business
All Dental Client Records from Seller's Database
All Dental Candidate Records from Seller's Database (Dentists currently working, or who have worked in the past, as well as Dentist "leads" in the Database)
All Credentialing Documentation – including the standard credentialing checklist for dental candidates limited to the Dentistry Business
Detailed Net Revenue and Time Sheet Records for all Locums limited to the Dentistry Business
Detailed Net Revenue and Time Sheet Records for all Retained Search limited to the Dentistry Business
Detailed Net Revenue and Time Sheet Records for all Contingent Placement limited to the Dentistry Business
Detailed Net Revenue and Time Sheet Records for all Permanent Placement limited to the Dentistry Business
Detailed Net Revenue and Time Sheet Records for all Executive Search History limited to the Dentistry Business

All documents associated with dental candidates including but not limited to CVs, licenses, certifications, applications, release & authorizations, claims documents, confirmation letters, etc. (i.e.: copy of provider folder and all QAs).
All application records of Dental candidates
All submittal records of Dental candidates
All Interview and Interview Schedule records of Dental candidates
All closing report / placement records of Dental candidates
All closing report schedule records of Dental candidates
All Job Records for Dental jobs
All Account records from seller's database for any facility that services Dentistry specialties.
All client contacts associated with any facility that services Dentistry
All activity history (call/email/text) in the past 2 years or longer with any dental candidate in Seller's database
All activity history  (call/email/text) in the past 2 years or longer with any account with a current or past contract that services dental specialties
All records of contract attempts (contracts sent out but not executed) with any facility that services dentistry specialties (i.e.: Contract Leads)
All facility credentialing applications / requirements for all contracted clients that service dentistry specialties
All documentation related to any client that services dentistry specialties (i.e.: facility submittal formats, facility credentialing/privileging process, facility applications, other documentation, etc.)
All processes and procedures and training material specific to the dentistry business (i.e.: Skills checklists, screening questions, credentialing requirements, dental-specific training, etc.)The Business includes the following specialties, and includes locums services, retained search services, executive search services, contingent search services, and any other service line of Curative from the list of specialties below:

DocuSign Envelope ID: 882BF439-E978-4986-B10B-CB345EF27BED

General Dentistry
Pediatric Dentistry
Orthodontics and Dentofacial Orthopedics
Endodontics
Periodontics
Prosthodontics
Oral/Maxillofacial Surgery
Oral/Maxillofacial Pathology
Oral/Maxillofacial Radiology
Dental Anesthesiology
Orofacial Pain
Oral Medicine
Dental Hygienists
Dental Assistants

**SCHEDULE 2 - LIST OF LAWSUITS**

1.      On June 21, 2021, Vanessa Cansino, a former patient at Gentle Dental (in Bakersfield, CA), sent a settlement demand letter in the amount of $60,000, alleging dental malpractice. The letter claimed Dr. Al-Hashimi and other dentists at Gentle Dental were negligent in her dental treatments that occurred between January - April 2021. Dr. Al-Hashimi was provided to Gentle Dental through Curative and this matter has been forwarded to Curative's insurance company for handling.  This matter remains pending.

## EXHIBIT A – BILL OF SALE

**See, Attached Bill of Sale**

DocuSign Envelope ID: 882BF439-E978-4986-B10B-CB345EF27BED

**EXHIBIT B**

Confirmation of Assignability of all Client Contracts for the Dentistry Business of Curative Talent, LLC

Proxi Healthcare Staffing, LLC d/b/a Proxi Dental Staffing (Proxi), by the signature of its authorized representative below, hereby confirms and agrees that it has reviewed and inspected all the Client Contracts for the Dentistry Business of Curative Talent, LLC being transferred by this Asset and Business Purchase Agreement and Schedule 1 (the "Agreement"); and, Proxi accepts and is satisfied that the obligation of Seller concerning the assignability of all Client Contracts of the Dentistry Business of Curative Talent, LLC as described in section 1.4(a) and 1.7(a)(ii) of the Agreement is fully satisfied.

Agreed: _Mark McGuire_____

Mark McGuire
Managing Member
Proxi Healthcare Staffing, LLC d/b/a Proxi Dental Staffing

## EXHIBIT C

Confirmation of the Preemptive Testing of Database Transfer for the Dentistry Business of Curative Talent, LLC

Proxi Healthcare Staffing, LLC d/b/a Proxi Dental Staffing (Proxi), by the signature of its authorized representative below, hereby confirms and agrees that it has reviewed and inspected the Preemptive Testing of Database Transfer for the Dentistry Business of Curative Talent, LLC for all data being transferred by this Asset and Business Purchase Agreement and Schedule 1 (the "Agreement"). Proxi accepts and is satisfied that the obligation of Seller concerning the Preemptive Testing of Database Transfer of the Dentistry Business of Curative Talent, LLC as described in section 1.4(b) of the Agreement is fully satisfied.

Agreed: _Mark McGuire_

Mark McGuire
Managing Member
Proxi Healthcare Staffing, LLC d/b/a Proxi Dental Staffing

DocuSign Envelope ID: 882BF439-E978-4986-B10B-CB345EF27BED

**EXHIBIT D**

Confirmation of Seller's Offer to Pay Award under PSU Agreement to Lindsay Harris and Joshua Kumher

Proxi Healthcare Staffing, LLC d/b/a Proxi Dental Staffing (Proxi), by the signature of its authorized representative below, hereby confirms and agrees that it is fully satisfied Seller has complied with section 1.4(c) and 1.7(a)(iii) of this Asset and Business Purchase Agreement, to wit: the offer to pay award under the PSU Agreement to Lindsay Harris and Joshua Kumher according to the terms of that PSU Agreement, and so long as the Performance Factor is achieved net of these payouts to Harris and Kumher, by March 31, 2022.

Agreed: Mark McGuire
Mark McGuire
Managing Member
Proxi Healthcare Staffing, LLC d/b/a Proxi Dental Staffing

## EXHIBIT E

Buyer confirms that Lindsay Harris and Joshua Kumher have entered into employment agreements with Buyer on terms mutually agreeable to Lindsay Harris and Joshua Kumher and Buyer and these agreements have been signed and executed by the necessary parties.

Confirmed and Acknowledged: _Lindsay Harris_
Lindsay Harris
Individually and as Managing Member
Proxi Healthcare Staffing, LLC d/b/a Proxi Dental Staffing

Confirmed and Acknowledged: _Josh Kumher_
Joshua Kumher
Individually and as Managing Member
Proxi Healthcare Staffing, LLC d/b/a Proxi Dental Staffing

Confirmed and Acknowledged: _Mark McGuire_
Mark McGuire
Managing Member
Proxi Healthcare Staffing, LLC d/b/a Proxi Dental Staffing

DocuSign Envelope ID: 882BF439-E978-4986-B10B-CB345EF27BED

## EXHIBIT F

Written approval, or resolution, of the Managing Member of Seller and the Board of Directors of Seller's parent entity for this Transaction.

DocuSign Envelope ID: 882BF439-E978-4986-B10B-CB345EF27BED

**EXHIBIT G**

Written confirmation from Mark McGuire, Lindsay Harris and Joshua Kumher that all wages, bonuses, reimbursements, payments for vacation, sick, PTO time, and for any other reason owed or claimed by them from Seller arising from their employment have been made prior to or at Closing, except for the possible Performance Factor attainment pertaining to Harris and Kumher indicated above in section 1.7(a)(iii) **(Exhibit G)**; For clarity, Lindsay Harris and Joshua Kumher acknowledge that their Q4'22 bonuses are not payable related to their resignations, nor are wages related to accrued vacation, sick or PTO time due based on their standing as Texas based employees, and only wages accrued up to the Closing time will be paid via a final check

Confirmed and Agreed:_____
Lindsay Harris
Individually and as Managing Member
Proxi Healthcare Staffing, LLC d/b/a Proxi Dental Staffing

Confirmed and Agreed:_____
Joshua Kumher
Individually and as Managing Member
Proxi Healthcare Staffing, LLC d/b/a Proxi Dental Staffing

Confirmed and Agreed:_____
Mark McGuire
Managing Member
Proxi Healthcare Staffing, LLC d/b/a Proxi Dental Staffing

**<u>EXHIBIT H</u>**

Written approval, or resolution, of the Managing Member of Buyer for this Transaction

DocuSign Envelope ID: 882BF439-E978-4986-B10B-CB345EF27BED

## **EXHIBIT I**

State of Texas certificate of formation of Buyer.

DocuSign Envelope ID: 882BF439-E978-4986-B10B-CB345EF27BED

## EXHIBIT J

Proof of Med Mal Insurance for Proxi with named additional insured status for Curative

DocuSign Envelope ID: 882BF439-E978-4986-B10B-CB345EF27BED

**EXHIBIT K**

Work in Progress Interview Fees Confirmation 1.3(g)(i):

Buyer ("Proxi"), by the signature of its authorized representative below, hereby confirms, approves and agrees to the list of Interview Fees, if any, presented to it by Seller for candidate interviews that took place prior to Closing but are not yet billed by Seller. Buyer agrees that the receipt and approval of this list, as acknowledged by its signature below, satisfies all of Seller's obligations under section 1.3(g)(i) of this Agreement.

Agreed: _Mark McGuire_

Mark McGuire
Managing Member
Buyer/Proxi Healthcare Staffing, LLC d/b/a Proxi Dental Staffing

DocuSign Envelope ID: 882BF439-E978-4986-B10B-CB345EF27BED

## EXHIBIT L

Work in Progress Placement Fees Confirmation 1.3(g)(ii):

Buyer ("Proxi"), by the signature of its authorized representative below, hereby confirms, approves and agrees to the (a) list of Placement Fees, if any, presented to it by Seller for candidates with an executed offer of employment from the client with a signature date on or prior to Closing but which have not yet billed by Seller; and, (b) the corresponding copies of executed employment contracts, if any, with dates of signature of both parties for inspection. Buyer agrees that the receipt and approval of this list and inspection of executed employment contracts, as acknowledged by its signature below, satisfies all of Seller's obligations under section 1.3(g)(ii) of this Agreement.

Agreed: *Mark McGuire*

Mark McGuire
Managing Member
Buyer/Proxi Healthcare Staffing, LLC d/b/a Proxi Dental Staffing

## **EXHIBIT M**

Notice to Aspen Dental of Post Close Order to Cash Process

**EXHIBIT 3**

On Fri, Jan 28, 2022 at 12:25 PM David Coffman <dcoffman@doximity.com> wrote:

Mark,

Confirming receipt here. Busy day for folks with board meeting and prep for earnings call, but we'll get back to you as soon as we get a chance to connect on this request.

Please let us know if you hear back from AMN in the meantime about requirements and estimated timing to resolve.

Thanks,

Redacted

On Thu, Jan 27, 2022 at 10:34 PM Mark McGuire <mmcguire@curativetalent.com> wrote:

AMN has denied the transfer of Curative's Aspen Dental contract to Proxi.  This is a material dental locums client ($33k of the $121k in dental locums forward-13 weeks if I understood Lindsay's report correctly).  Keep in mind that the original LOI contemplated an F-13 of $150k at closing, so while $121k causes heartburn, losing another $33k simply doesn't work.

There is a solution.  AMN said Curative could continue to manage the contract until Proxi is able to meet AMN's "standard" financial requirements (still waiting on a response for what those standards are).  In other words, Curative would still invoice AMN for the scheduled candidate, then pass that revenue through to Proxi.  We can get the exact dates of work from Redacted                                Proxi would pay the provider (if allowed), thus avoiding any negative cash hit to Curative.

On a positive note, this looks to be the only client issue on the locums side.  Please let me know if the pass-through arrangement is acceptable for Curative.

Mark

**EXHIBIT 4**

**\*\*\*DO NOT REPLY TO THIS DOCU-SIGN EMAIL\*\*\***

**\* If you have any questions or concerns, I can be reached at** Redacted **or via email at**

Redacted

**December 14, 2021**

**Attention:** Redacted

**Assignment Cancellation – Non-Billable**

This letter confirms your agreement for the following Healthcare Professional for an assignment at **Aspen Dental – Waycross, GA** for the dates listed below under the terms in the parties' Agreement for Locum Tenens Coverage ("Agreement").

**Healthcare Professional:** Redacted
**Specialty:** Dentist
**Cancelled Dates:** 1/31/22 – 2/04/22, 2/07/22 – 2/11/22, 2/14/22 – 2/18/22, 2/28/22 – 3/04/22, 3/07/22 – 3/11/22, 3/14/22 – 3/18/22, 3/28/22 – 4/01/22, 4/05/22 – 4/08/22, 4/11/22 – 4/15/22, 4/18/22 – 4/22/22, 4/25/22 – 4/29/22, 5/02/22 – 5/06/22, 5/09/22 – 5/13/22, 5/16/22 – 5/20/22
**Location:** Aspen Dental – **Waycross, GA** *(2271 Memorial Drive)*
**Shiftwise ID:** 9603872

Client agrees to pay AMN for the services rendered by the Healthcare Professional according to the schedule listed above.

| Rate Type | Bill Rate | Additional Terms |
|---|---|---|
| Regular Daily | $1325.00 | |
| Overtime | $189.00 | 8.00 Daily |

*Practice (or Locum Tenens Provider) may cancel Scheduled Services by providing written notice to Agency. Such Cancellation shall be effective ten (10) Business days after Agency's actual receipt of such written notice. Business days are considered Monday – Friday and do not include Federal Holidays, Saturdays or Sundays. Mileage reimbursement is invoiced/paid at the current IRS approved standard mileage rate for personal vehicle use.*
*If you do not accept or agree with the terms set forth herein, you must notify Staff Care within 48 hours of receipt of the Confirmation Letter. Failure to do so constitutes acceptance of the terms and conditions set forth above.*

This letter confirms the assignment and rate details we previously discussed and agreed to. **Please Sign below** to confirm this letter accurately depicts our agreement. If this letter does not accurately reflect the terms you agreed to, **please respond immediately** and note any discrepancies or contact your account manager immediately. If you do not accept or agree with the terms set forth herein, you must notify AMN within 48 hours of receipt of the Confirmation Letter. Failure to do so constitutes acceptance of the terms and conditions set forth above.

*For after-hours Emergency Service you may contact a member of the AMN team at (800) 685-2272.*

**OFFERED BY: AMN Healthcare**

Redacted

Redacted

**EXHIBIT 5**





**EXHIBIT 6**



**EXHIBIT 7**

**Jeff Bowling**                                    9:04 PM (22 minutes ago)  ☆  ↩  ⋮

Okay, looks like you and Babb are aligned and things are progressing.

I don't know of any searches in contingency for Rob.

I didn't know about the exec search for the director-level, non-clinical role. Is it your position that the non-clinical account/search is yours as well? I assume you do since there is $15K due from the account.

Jeff

**EXHIBIT 8**

PROXI HEALTHCARE STAFFING, LLC
Purchase Price Overpayment - based on Valuation Model used in original purchase of Curative's Dental Staffing Line, and subsequent impact of misrepresentations

| | ORIGINAL 12-MO PROJECTION | REVISED 12-MO PROJECTION | NOTES: |
|---|---|---|---|
| *Gross Profit:* | | | |
| Perm/Exec GP | $200,000 | $200,000 | $200k was based on Curative's 3-year run rate for total perm/exec revenue. |
| Redacted | | ($35,000) | Deduction of GP for withheld Client #1 Adult Dental search ($15k fee due March 2022, plus $20k placement fee) |
| Locums GP | $750,000 | $750,000 | $750k estimate based on F-13 of $150k at closing. Quarterly goals were $160k, $175k, $195k, and $220k, respectively. |
| Dr. P Cancellation | | ($44,372) | See attachment - "Cost of Dr. P Cancelled Shifts." |
| Total Gross Profit | $950,000 | $870,628 | |
| *Expenses:* | | | |
| Salary | $300,000 | $300,000 | Year 1 - plan was 3 partners at $100k salary each. |
| Commission | $160,000 | $160,000 | Estimated Year 1 commissions based on projected GP. |
| Commission Reduction | | ($13,368) | Reduced to account for GP decrease from $950k to $864k. |
| Employee Tax/Bene's | $60,000 | $60,000 | Estimated Taxes on compensation plus benefits package. |
| Tax Reduction | | ($1,744) | Reduced to account for lower employer taxes from reduced commissions. |
| Software | $35,000 | $35,000 | SalesForce, including custom development, plus Accounting Seed, Panda Docs, and other necessary software. |
| Candidate Sources | $25,000 | $25,000 | LinkedIn, Indeed, DentisttoDoc/e.com, and similar candidate sourcing sites. |
| Legal/Professional | $5,000 | $5,000 | This was primarily budgeted for our operating agreement and other typical start-up legal expenses. |
| Legal Expense Increase | | $35,000 | Additional legal expense brought on by the Curative Misrepresentation matter. |
| G&A Expense | $25,000 | $25,000 | Office supplies, postage, meals, travel, etc. |
| Total Expenses | $610,000 | $629,888 | |
| EBITDA | $340,000 | $240,740 | |
| Multiple | 2.5x | 2.5x | 2.5 times EBITDA multiple was on the higher range for a locum tenens sale of this size. |
| Offer | $850,000 | $601,849 | Curative's only other cash offer on the dentistry sale was for $300,000. |

Difference in Calculated Offer:    $248,151

If you keep all aspects of the original valuation model the same except for the items that were impacted by
Curative's misrepresentations, this number represents Proxi's overpayment in purchase price

**EXHIBIT 9**

**Opportunity Cost to Proxi from Remediation of Curative Misrepresentations**

Date Range: 02/07/22 - 09/08/22

Hours Spent by Partner by Category:

| | Client #1 Dental Search Issue | | | Dr. P Issue | | | Legal Prep | | | Total: |
|---|---|---|---|---|---|---|---|---|---|---|
| | Mark | Lindsay | Josh | Mark | Lindsay | Josh | Mark | Lindsay | Josh | |
| Feb-22 | 18.0 | 5.5 | 2.0 | 6.0 | 9.5 | 12.0 | - | - | - | 53.0 |
| Mar-22 | 7.5 | 3.0 | 1.5 | 4.0 | 6.5 | 15.0 | 37.0 | 13.0 | 5.5 | 93.0 |
| Apr-22 | - | - | - | 2.5 | 6.0 | 10.5 | 4.0 | 1.5 | 1.5 | 26.0 |
| May-22 | - | - | - | 6.5 | 13.0 | - | 23.5 | 9.0 | - | 52.0 |
| Jun-22 | - | - | - | - | - | - | 5.5 | 3.0 | - | 8.5 |
| Jul-22 | - | - | - | - | - | - | 17.5 | 4.5 | - | 22.0 |
| Aug-22 | - | - | - | - | - | - | 21.5 | 14.5 | - | 36.0 |
| Sep-22 | - | - | - | - | - | - | 13.5 | 4.5 | - | 18.0 |
| | 25.5 | 8.5 | 3.5 | 19.0 | 35.0 | 37.5 | 122.5 | 50.0 | 7.0 | 308.50 |

Available Working Hours by Month:

| | Mark | Lindsay | Josh | Total: | Opportunity Cost Hours: | | Total Proxi Focus Hours: |
|---|---|---|---|---|---|---|---|
| Feb-22 | 128.0 | 128.0 | 128.0 | 384.0 | 53.0 | 13.8% | 331.0 |
| Mar-22 | 184.0 | 184.0 | 184.0 | 552.0 | 93.0 | 16.8% | 459.0 |
| Apr-22 | 168.0 | 168.0 | 168.0 | 504.0 | 26.0 | 5.2% | 478.0 |
| May-22 | 168.0 | 168.0 | - | 336.0 | 52.0 | 15.5% | 284.0 |
| Jun-22 | 176.0 | 176.0 | - | 352.0 | 8.5 | 2.4% | 343.5 |
| Jul-22 | 160.0 | 160.0 | - | 320.0 | 22.0 | 6.9% | 298.0 |
| Aug-22 | 184.0 | 184.0 | - | 368.0 | 36.0 | 9.8% | 332.0 |
| Sep-22 | 40.0 | 40.0 | - | 80.0 | 18.0 | 22.5% | 62.0 |
| | 1,208.0 | 1,208.0 | 480.0 | 2,896.00 | 308.50 | 10.7% | 2,587.50 |

**Opportunity Cost:**

**Wages:**

| | |
|---|---|
| Proxi Partner's Annual Salary: | $100,000 |
| Employer Taxes @ 8.0%: | $8,000 |
| | $108,000 |
| Annual Work Hours: | 2,080 |
| Hourly Cost per Proxi Partner | $51.92 |
| | |
| Opportunity Cost Hours 02/07/22 to 09/08/22: | 308.50 |
| **Opportunity Cost - Wages:** | **$16,018** |

**Gross Profit:**

| | | |
|---|---|---|
| Proxi Total GP Booked 02/07/22 to 09/08/22: | $534,533 | (see attachment "GP Added by Month") |
| Proxi Focus Hours 02/07/22 to 09/08/22: | 2,587.50 | |
| Avg GP Booked per Proxi Focus Hour: | $206.58 | |
| | | **Total Opportunity Cost** |
| Opportunity Cost Hours 02/07/22 to 09/08/22: | 308.50 | |
| **Opportunity Cost - Gross Profit:** | **$63,731** | **$79,749** |

**EXHIBIT 10**

**Damage Summary**
**Proxi Healthcare Staffing vs. Curative Talent**

Proxi's Damages from Curative's Misrepresentations fall into 2 Categories:

|  |  |  |
|---|---|---|
| 1. Purchase Price Overpayment | | $248,151 |
| 2. Opportunity Cost from Remediation | | |
| a. Lost Wages | $16,018 | |
| b. Lost Gross Profit | $63,731 | |
| Total Opportunity Cost | | $79,749 |
| **TOTAL DAMAGES** | | **$327,900** |

| "Dr. P" - Cancelled Shifts by Day and Resulting Losses | | | | | | | |
|---|---|---|---|---|---|---|---|
| Date | Hours | Revenue | Pay | Gross Profit | | | |
| 2/28/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | Lost Gross Profit Total: | $31,171.88 |
| 3/1/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 3/2/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | Notice Liability: | $13,200.00 |
| 3/3/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 3/4/2022 | 8.00 | $1,325.00 | $800.00 | $525.00 | 8-hr Guarantee | TOTAL | $44,371.88 |
| 3/7/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 3/8/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 3/9/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 3/10/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | Mark McGuire: Per Dr. P's contract with Curative, he is to be given a 30-day notice of shift cancellation. Any shifts within that window are obligated to be paid when cancelled. We discovered Dr. P's cancellation on February 22, 2022 and let him know that day. This meant that payment to Dr. P for all shifts through the end of March 24, 2022 became a liability to Proxi. | |
| 3/11/2022 | 8.00 | $1,325.00 | $800.00 | $525.00 | 8-hr Guarantee | | |
| 3/14/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 3/15/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 3/16/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 3/17/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 3/18/2022 | 8.00 | $1,325.00 | $800.00 | $525.00 | 8-hr Guarantee | | |
| 3/28/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 3/29/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 3/30/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 3/31/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 4/1/2022 | 8.00 | $1,325.00 | $800.00 | $525.00 | 8-hr Guarantee | | |
| 4/4/2022 | - | $0.00 | $0.00 | $0.00 | | | |
| 4/5/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 4/6/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 4/7/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 4/8/2022 | 8.00 | $1,325.00 | $800.00 | $525.00 | 8-hr Guarantee | | |
| 4/11/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 4/12/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 4/13/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 4/14/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 4/15/2022 | 8.00 | $1,325.00 | $800.00 | $525.00 | 8-hr Guarantee | | |
| 4/18/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 4/19/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 4/20/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 4/21/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 4/22/2022 | 8.00 | $1,325.00 | $800.00 | $525.00 | 8-hr Guarantee | | |
| 4/25/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 4/26/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 4/27/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 4/28/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 4/29/2022 | 8.00 | $1,325.00 | $800.00 | $525.00 | 8-hr Guarantee | | |
| 5/2/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 5/3/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 5/4/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 5/5/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 5/6/2022 | 8.00 | $1,325.00 | $800.00 | $525.00 | 8-hr Guarantee | | |
| 5/9/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 5/10/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 5/11/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 5/12/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 5/13/2022 | 8.00 | $1,325.00 | $800.00 | $525.00 | 8-hr Guarantee | | |
| 5/16/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 5/17/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 5/18/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 5/19/2022 | 9.00 | $1,490.63 | $900.00 | $590.63 | | | |
| 5/20/2022 | 8.00 | $1,325.00 | $800.00 | $525.00 | 8-hr Guarantee | | |